**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

In re

    **GERALD R. MILLER**,    Case No. **15-61159-12**

        Debtor.

## MEMORANDUM OF DECISION

At Butte in said District this 1st day of April, 2016.

In this Chapter 12 case the Debtor Gerald R. Miller ("Debtor" or "Miller") has filed a motion (Document No. 25) to assume executory contracts and leases with Farm Service Agency, Carl Elliott, estate of Theresa Hansmann, and Mike's Muffler, on the grounds he derives income from them and they are necessary for his reorganization. Creditor CHS, Inc. ("CHS") filed objections on the grounds the Debtor has not produced the leases or shown the terms of the leases, as required by *Official Creditors' Committee v. X10 Wireless Technology, Inc. (In re X10 Wireless Technology, Inc.)*, 2005 WL 6960205 (9th Cir. BAP 2005), or whether they have expired, and has not shown that assumption of the leases would be beneficial to the estate under 11 U.S.C. § 365. A hearing on Debtor's motion to assume was held at Great Falls on March 11, 2016. Debtor appeared and testified, represented by attorney Gary S. Deschenes of Great Falls. CHS was represented by attorney Eric Edward Nord ("Nord") of Crist, Krogh & Nord, PLLC, of Billings. The Chapter 12 Trustee Joseph V. Womack appeared. Exhibits ("Ex.") 1 and 2 were admitted. At the conclusion of the parties' cases-in-chief the Court heard argument from the parties' counsel, then took Debtor's motion under advisement. After review of Debtor's motion, CHS's objection, the record and applicable law, this matter is ready for decision. CHS's

objection is overruled and Debtor's motion to assume leases will be granted.

This Court has exclusive jurisdiction of this Chapter 12 bankruptcy case under 28 U.S.C. § 1334(a). Debtor's motion to assume leases and executory contracts is a core proceeding under 28 U.S.C. § 157(b)(2)(M) involving the use or lease of property.

## FACTS & PROCEDURAL HISTORY

Debtor Gerald R. Miller is a farmer who lives with his wife at 1516 Manson Road, Conrad, Montana. Miller has been farming since 1967 while he was still in high school on his mother's property and later on his own property and on leased property. In addition to farming, Miller raised some cattle in the recent past, owns an auto repair business[1] in Conrad, which he verbally leases to Mike Lytle who operates Mike's Muffler shop. Miller is co-personal representative of the estate of his deceased mother Theresa Hansmann. He testified that his mother's estate is engaged in ongoing litigation regarding distribution of the estate.

CHS, Inc., is a Minnesota corporation, does business under the Cenex brand and operates Zip Trips stores. CHS sold Miller fertilizer and chemicals. When Miller failed to pay CHS for the chemicals and fertilizer, CHS sued him. CHS obtained a judgment and levied an execution of its judgment against Miller's vehicles, trailer, equipment and crops in grain bins owned by his mother's estate. Miller testified that CHS has a lien on his real property.

With respect to agricultural leases with Carl Elliott and his mother's estate for which Miller requests approval, he testified that he has discussed lease terms with other farmers in his area, that the terms and verbal nature of his leases with Carl Elliott and his mother's estate are

---

[1] Debtor's Statement of Financial Affairs lists at item 27 "Gerald's Auto Service" in Conrad as a business Debtor owned or had a connection to within 4 years before his bankruptcy.

2

normal among agricultural producers in his area and that he has entered into leases with other farms under similar terms and conditions. That evidence is uncontroverted. Under cross examination Miller testified that parties to leases may negotiate different shares of crops and, in the end, it comes down to what the parties agree on.

With respect to Farm Service Agency ("FSA") leases, Miller testified that he has no FSA contracts at present, although he may receive a disaster payment in the approximate amount of $600 and that there is no downside to him assuming FSA contracts.

Miller testified that he has been farming on his mother Theresa Hansmann's land since 1967. They had a year-to-year lease. Miller described the terms of that lease as he performs the labor at no charge to his mother; he provides the seed; his mother's estate pays for the water shares; and he and his mother's estate split the proceeds of crops 50:50; and their respective livestock is treated as provided in their agreement.[2] Ex. 2 includes written agreements between Miller and Theresa Hansmann dated November 3, 2009, and an agreement between Miller and his mother's estate dated March 15, 2015, which provides at paragraph 7 that the agreement lasts until the closing of his mother's estate. Miller testified that he has a lease agreement in place with his mother's estate now; no evidence to the contrary exists in the record.

Miller testified that he has had a year-to-year verbal lease with Carl Elliott ("Elliott") to raise barley and grass on Elliott's property for several years and that he kept the lease under the same terms as before. Miller testified that Elliott pays for the cost of water; and that Miller pays the expenses for fuel, seed, fertilizer and equipment in return for which Miller gets a 2/3 share of crops in return, while Elliott gets 1/3 share. Miller testified these are normal lease terms.

---

[2] Miller testified there is no share agreement with his mother's estate regarding cattle.

3

Miller testified that the yield from his lease with Carl Elliott was 1,800 bushels per acre, of which Miller gets a 2/3 share. The price Miller gets for the barley from the Carl Elliott lease depends on when he gets it hauled, and feed barley sells at a price approximately half of the price of malt barley.

Ex. 1 are FSA reports of commodities for FSA program years 2013, 2014, and 2015, listing Miller and Elliott as producers, their respective shares, crop quantities and any fallow. Miller testified that he has had the verbal lease with Elliott for his land for several years, which consists of 40 acres irrigated land, 37 acres dry ground and 30 acres swampy ground. Miller's signature on the 2015 program year on Ex. 1 is dated 8-27-15. Ex. 1 shows that Miller has a 100% share of the grass. He testified that the grass is on a corner of the Elliott property where he runs some of his cattle.

Miller testified that the lease of Mike's Muffler produces no cash for Miller, but that Mike's Muffler provides Miller with batteries, oil and some parts and the lessee maintains the property. Miller pays the real estate taxes. He testified that he hopes that Mike Lytle will purchase the Mike's Muffler property from him and that such a sale would benefit Miller because it would pay off the secured claim of Teton Bank. Under cross examination Miller admitted that he does not have a buy/sell agreement with Mike Lytle at present.

Miller filed a voluntary Chapter 12 petition on December 16, 2015, and filed his Schedules, Statement of Financial Affairs ("SOFA") on January 20, 2016. Miller testified: that grain prices had declined; and that the sheriff seized his crops or he would have been able to sell them at a profit.

Schedule A lists Miller's real property, including the location of Mike's Muffler at 709 S

Main St. in Conrad. Schedule D lists Teton Bank as a creditor with a claim secured by 709 S Main St. in Conrad, with a claim stated in the amount of $121,950.85 and a value of $145,550.

Debtor's Schedule G lists five (5) executory contracts and unexpired leases. One is described as "all farm programs with Farm Service Agency." Another is a verbal lease with Carl Elliott for 102.17 acres of crop land and 98.75 acres grass, with Miller to get a 2/3 share and Carl Elliott a 1/3 share. Another verbal lease is with the estate of Theresa Hansmann for 149.83 non-irrigated acres at 50%/50%. Schedule G states that the Hansmann lease has been in effect since 1967. The last lease listed on Schedule G is with Mike's Muffler described as "Lease of building and equipment for Mike Lytle for Mike's Muffler."

Schedule I states that Miller earns all his annual income, estimated at $36,165.41, from farming.

Debtor's SOFA at item 9 ("Legal Actions . . . .") lists the litigation against Miller by CHS in the Montana Ninth Judicial District Court which resulted in a judgment being entered in May 2014. Item 10 on the SOFA lists several trucks, a trailer and grain bins repossessed, seized or levied against by CHS.

Debtor filed his motion to assume executory contracts and leases on February 12, 2016. CHS filed its objections on February 16, 2016, on the grounds the Debtor has not produced the leases or shown the terms of the leases or whether they have expired and has not shown that assumption of the leases would be beneficial to the estate under 11 U.S.C. § 365.

No allegation or evidence exists in the record that any of the leases which are the subject of Debtor's motion to assume are in default. Miller testified that he has no doubt that the leases which he moves to assume in the pending motion enhance and benefit his estate. He further

testified that in his opinion he will make money on his farming operations this year. CHS called no witness of its own at the hearing, so Miller's testimony is uncontroverted. The Court finds, after observing Miller while he testified under oath and cross examination, that Miller is competent and credible.

## DISCUSSION

A debtor in Chapter 12, as trustee,[3] may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). A debtor's decision to assume unexpired leases is subject to bankruptcy court approval. *In re Lathrop*, 20 Mont. B.R. 253, 257 (Bankr. D. Mont. 2002); *In re Emerald Forest Construction, Inc.*, 226 B.R. 659, 662, 17 Mont. B.R. 209, 213 (Bankr. D. Mont. 1998). The court's decision may be retroactive. *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1065, 1075 (9th Cir. 2004).

In *X10 Wireless* the bankruptcy court granted a debtor in possession's motion to assume unexpired nonresidential leases. The BAP reversed and remanded for an evidentiary hearing because debtor failed to present evidence that assumption was likely to benefit the estate. *X10 Wireless*, 2005 WL 6960205 at *4. In the instant case, by contrast, this Court conducted an evidentiary hearing after due notice on March 11, 2016. The Debtor appeared and testified, and offered Ex. 1 and 2 which were admitted. Debtor's testimony and exhibits constitute evidence showing the existence of the leases with Carl Elliott, his mother's estate and Mike's Muffler. Debtor testified that all of the leases are likely to benefit the estate. CHS called no witnesses and offered no exhibits. The evidentiary hearing conducted by this Court distinguishes the instant

---

[3] A debtor has all rights and powers, other than certain rights and powers not pertinent in the instant contested matter, of a trustee serving in a case under chapter 11, including operating the debtor's farm. 11 U.S.C. § 1203.

case from *X10 Wireless* where the debtor failed to present evidence that assumption was likely to benefit the estate. *X10 Wireless*, 2005 WL 6960205 at *4.

A leading bankruptcy commentator explains that a "motion to assume or reject is a summary proceeding, 'intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate.'" 3 COLLIER ON BANKRUPTCY, ¶ 365.03[2] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013) (quoting *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)* 4 F.3d 1099, 1098 (2nd Cir. 1993)).

COLLIER also discusses the appropriate test for courts to apply to a debtor's decisions to assume or reject leases:

> Under the Code, most courts have applied a "business judgment" test to trustees' decisions to assume or reject contracts or leases. For example, in *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, the Court of Appeals for the Second Circuit expanded upon its prior decision in *In re Minges*, and explained that the court's role in the assumption/rejection process "as [one of] an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." The Court found that "a bankruptcy court reviewing a trustee's or debtor in possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it."
>
> Although the business judgment is the proper standard for determining whether to permit assumption or rejection of an executory contract or unexpired lease, the court should focus on the business judgment of the trustee or debtor in possession, not on its own business judgment. The Court of Appeals for the Ninth Circuit has adopted an even broader reading of the business judgment rule in the context of executory contract rejection (and presumably assumption as well), [*Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Medical Grp., Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007)] adopted the nonbankruptcy form of the business judgment rule: In reviewing a rejection motion, the bankruptcy court

> should presume that the debtor in possession "acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate" and should approve rejection unless the "conclusion that rejection would be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice. Adverse effects on the other contract party is not relevant unless the effect is so disproportionate to the estate's prospective advantage that it shows rejection could not be a sound exercise of business judgment.

3 COLLIER ON BANKRUPTCY, ¶ 365.03[2].

In affirming this Court's approval of a debtor's rejection of an executory contract, the district court applied the presumption from *Pomona Valley* that in evaluating a debtor's decision the court "'should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate.'" *In re Yellowstone Mountain Club, LLC*, 2010 WL 5071354, * 2 (D. Mont.), *aff'd.*, 486 F. App'x. 720 (9th Cir. 2012) (quoting *Pomona Valley*, 476 F.3d at 670) . "It should approve the decision to reject an executory contract 'unless it finds that the debtor-in-possession's conclusion that rejection would be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice.'" *Id.* The same reasoning for rejection under § 365(a) applies to a debtor's decision to assume leases. *See, e.g.,* 3 COLLIER ON BANKRUPTCY, ¶ 365.03[2].

While a debtor or trustee, in exercising business judgment, must demonstrate that assumption will benefit the estate, "[a]s long as assumption of a lease appears to enhance a debtor's estate, a bankruptcy court should normally grant its approval, unless the debtor in possession's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *X10 Wireless*, 2005 WL 6960205 at *3 (internal quotation marks and

citations omitted)

CHS's objection states: "The Bankruptcy Court applies a much more probing standard when adjudicating the validity of a contract under Section 365. *In re G.I. Industries, Inc.*, 204 F.3d 1276, 1282 (9th Cir. 2000)." That statement mischaracterizes the analysis and conclusion of the Ninth Circuit's decision in *G.I. Industries*. In that case, the trustee moved to reject an executory contract, which the bankruptcy court granted because the rejection "was within the sound business judgment" of the trustee. *GI Industries,* 204 F.3d at 1279. The creditor, pursuant to 11 U.S.C. § 365(g), filed a proof of claim for its damages caused by the rejection. *Id.* The trustee objected to the proof of claim on the grounds the contract was unenforceable; the bankruptcy court disallowed the claim in its entirety under 11 U.S.C. § 502(b)(1). *Id.* The creditor appealed and the Ninth Circuit affirmed. 204 F.3d at 1282.

The bankruptcy court in *GI Industries* did not determine the validity of the contract at the time of rejection. *Id.* The Ninth Circuit wrote:

> A bankruptcy court's hearing on a motion to reject is a summary proceeding that involves only a cursory review of a trustee's decision to reject the contract. Specifically, a bankruptcy court applies the business judgment rule to evaluate a trustee's rejection decisions, while it would employ a much more probing standard in adjudicating the validity of a contract. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (recognizing that the business judgment rule is used in reviewing motions to reject executory contracts).
>
> Based on the nature of a motion to reject and its complementary proceedings, it is inappropriate for the court to resolve questions involving the validity of a contract at the time of rejection. As the Second Circuit notice in *Orion Pictures Corp. V. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993), "permitting a bankruptcy court to rule conclusively on a decisive issue of breach of contract would render the use of 'business judgment' . . . unnecessary." *Id.*, at 1099. *Orion* correctly recognizes that adjudicating the validity of a contract at the time of rejection would turn a summary proceeding into a full trial on the merits, a result that would be inconsistent with the procedures found in the Bankruptcy Code. Instead, our approach gives effect to the

plain language of the Bankruptcy Code and allows a bankruptcy judge to postpone consideration of the validity of a contract until a full adversary proceeding can take place.

*G.I. Industries*, 204 F.3d at 1280.

The instant case is distinguishable from *GI Industries* because (a) Debtor moves to assume leases not reject them, so there is no breach under § 365(g) pursuant to which the lessees could file a proof of claim; (b) no proofs of claim have been filed by the lessees and thus there are no objections to claims pending; and therefore (c) this Court does not determine the validity of the leases because "it is inappropriate for the court to resolve questions involving the validity of a contract at the time of rejection." *GI Industries*, 204 F.3d at 1282.

Thus, this Court does not apply, as CHS contends, "a more probing standard" but rather undertakes "a summary proceeding that involves only a cursory review of a trustee's decision to reject the contract." *Id.* Miller moves to assume the leases with FSA, Carl Elliott, estate of Theresa Hansmann, and Mike's Muffler. He testified about the terms of the leases and his opinion that assumption would be beneficial to the estate. His testimony is uncontroverted. The evidence shows that Miller may receive funds from FSA. He has longstanding leases with Carl Elliott and the estate of Theresa Hansmann which produces advantageous crop shares by which he has profited.

This Court focuses on the business judgment of the Debtor, not on its own business judgment. *See,* 3 COLLIER ON BANKRUPTCY, ¶ 365.03[2]. The Court presumes that the Debtor acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate. *In re Yellowstone Mountain Club, LLC*, 2010 WL 5071354 at * 2. The Court should approve the decision to assume the leases unless it finds

that the Debtor's conclusion that acceptance would be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice.  *Yellowstone Mountain Club,* 2010 WL 5071354 at * 2.

Based on Miller's uncontroverted testimony that assumption of the leases would benefit the estate, the Court concludes that the Debtor's conclusion that the leases with Carl Elliott and his mother's estate is not manifestly unreasonable and not based on bad faith, whim or caprice. *Id.*  No current FSA leases exist, but the Debtor's expectation of a disaster payment from FSA and its participation in the Carl Elliott leases have been shown by Ex. 1 and Miller's testimony to be beneficial to the estate, with no downside, so the Court as normal grants its approval and finds that Debtor's judgment is not clearly erroneous, too speculative or contrary to the provisions of the Bankruptcy Code.  *X10 Wireless*, 2005 WL 6960205 at *3.

The benefits to the estate of the lease with Mike's Muffler are not so immediately apparent.  However, Miller testified that the lease benefits the estate in the form of batteries, oil and some parts which he uses in his farming operations.  Plus the lessee maintains the property and saves Miller that expense.  Miller testified that he hopes that the lessee will purchase the Mike's Muffler property from him and that such a sale would benefit Miller because it would pay off the secured claim of Teton Bank.  Debtor's Schedules show value of the Mike's Muffler property in excess of the claim of Teton Bank, suggesting equity which might be available to pay other creditors.  It makes sense that a property with a going concern on it would be easier to sell than a property with an empty automobile repair shop.  As with the other leases, the Court presumes that the Debtor acted prudently, on an informed basis, in good faith, and in the honest belief that assumption of the lease with Mike's Muffler in the best interests of the bankruptcy

estate. *Yellowstone Mountain Club,* 2010 WL 5071354 at * 2. There being no evidence in the record that assumption of the leases is not beneficial to the estate,

    **IT IS ORDERED** a separate Order shall be entered overruling CHS's objections and granting Debtor's motion to assume executory contracts and leases.

_____
Honorable Ralph B. Kirscher
Chief U.S. Bankruptcy Judge